IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RICHARD CHASE MAHER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:21cv00143 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BENJAMIN THOMSON, | ) | By:  Hon. Thomas T. Cullen |
| | ) |       United States District Judge |
| Defendant. | ) | |

Plaintiff Richard Chase Maher, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendant, Benjamin Thomson, denied him appropriate mental health treatment. This matter is currently before the court on Thomson's Motion for Summary Judgment. Maher responded to the motion, and this matter ripe for consideration. After reviewing the motion and the undisputed record, the court concludes that Thomson's motion must be granted.

## I. BACKGROUND

### A. Maher's Claims

The court has previously summarized the sequence of events that Maher alleges in his verified § 1983 Complaint:

> Maher arrived at Central Virginia Regional Jail ("CVRJ") as a pretrial detainee on February 2, 2019. He alleges that "tra[u]matic events that lead to [his] arrest and the stress of [his] pending criminal charges lead to severe mental deterioration" and deterioration of his physical health as well. (Compl. 3 [ECF No. 1].) During his first several months at CVRJ, Maher contends that he wrote multiple requests asking to see a psychiatrist. Each time, Benjamin Thomson (whom Maher describes as a "Behavioral Counselor") replied that Maher was on the list to see the jail's

psychiatrist. (*Id.* at 2.) Maher also saw Behavioral Counselor Thomson at least three times and repeatedly discussed his desire to see the psychiatrist, among other things. Maher asserts that his sessions with Thomson "did not resolve [his] issues," but that Thomson did not arrange for him to see the psychiatrist. (*Id.* at 4.) Maher alleges that during these months, he "suffered a suicide attempt," "picked large holes into [his] neck and lips that now have permanent scars," and lost more than twenty-five pounds. (*Id.*) He states that he was unable to "focus [his] thoughts" and was severely "anxious," making it hard for him to communicate. (*Id.*)

In early July 2019, Dr. Ottoleni, the medical doctor at CVRJ, allegedly determined that Maher needed psychiatric help because of the adverse effect his mental health was having on his physical condition. Dr. Ottoleni allegedly referred Maher for an appointment that was scheduled for July 10, 2019. That day, Correctional Officer Mays escorted Maher to the medical office, where, Maher says, he found Thomson waiting for him. Thomson "berated" Maher for "going above him to seek resolve for the mental problems." (*Id.* at 5.) Thomson purportedly stated that he had control over who would see the psychiatrist and when, and "blatantly confessed to denying [Maher] medical care." (*Id.*)

*Maher v. Thomson*, No. 7:21cv00143, 2021 WL 6072566, at *1 (W.D. Va. Dec. 23, 2021). The claim remaining before the court seeks monetary damages against Thomson for allegedly denying Maher mental health treatment.

### B. Thomson's Undisputed Summary Judgment Evidence

Thomson is a licensed professional counselor who provides counseling for CVRJ inmates, conducts risk assessments to determine if an inmate is at risk for self-inflicted harm, and implements mitigation measures to decrease that risk.[1] Thomson is not a psychiatrist and is not authorized to prescribe medication. Inmates at CVRJ can request assistance and care for

---

[1] Thomson supports his summary judgment motion with his own declaration ("Thomson Decl." [ECF No. 34-1]) and attached medical records from Maher's course of treatment at CVRJ ("Ex."). Maher does not dispute the accuracy of the medical records or of Thomson's summary of Maher's medical care at CVRJ.

non-emergencies by submitting a written Inmate Request Form. Staff will refer a request form to Thomson if it indicates a need for mental health treatment. Thomson then determines whether to respond in writing or schedule an appointment for in-person counseling with the inmate.

Thomson first saw Maher for a mental health consultation on February 4, 2019, when CVRJ correctional officers brought him to Thomson's office following a court hearing. Maher immediately asked for a sedative. Thomson told him that jail medical staff do not prescribe sedatives and that, as a counselor, he could not prescribe any medicine. Maher then complained about anxiety and asked for medication. Assessing this presentation, Thomson believed that Maher was exaggerating his mental state to receive prescription medicine. Nevertheless, Thomson referred Maher to the CVRJ's physician, Dr. Ottolini, for further evaluation because CVRJ did not have a psychiatrist on contract at that time.

As a result of Thomson's referral, staff scheduled Maher to see Dr. Ottolini on February 14, 2019, for his complaints of anxiety. Maher refused to attend that appointment and signed a refusal form. On February 20, 2019, Maher completed an Inmate Request Form asking to see the doctor for mental health medication. Staff rescheduled his appointment, and he met with Dr. Ottolini on March 8, 2019. The doctor prescribed Lexapro and Vistaril for Maher's complaints of anxiety and depression.

On April 11, 2019, Thomson saw Maher for complaints about anxiety and mood. He noted that Maher's appearance, orientation, and attention seemed normal, and that Maher denied suicidal or homicidal ideations and delusions. Thomson also reported that Maher denied having had any previous mental health treatment. Thomson stated that Maher's

reported symptoms appeared to differ and change from one encounter to another if he did not get what he wanted. Thomson's notes listed the medicines prescribed for Maher's mental health complaints and indicated (for the doctor) that the medications might need to be adjusted. On this visit, Thomson also ordered that Maher should see a psychiatrist, although CVRJ did not yet have one on contract. Nevertheless, staff placed Maher's name on a list for a future appointment.

On May 14, 2019, Thomson met with Maher because, on an Inmate Request Form, Maher said he was "chewing" his "lips off" and not sleeping. (Thomson Decl. ¶ 14; Ex. 6.) Maher was still prescribed Lexapro and Vistaril for his anxiety and mood and remained on the list to see the psychiatrist. Thomson noted that Maher's appearance, speech, affect, orientation, and attention were normal and that he self-reported having "paranoid beliefs," but without specifying what those beliefs were. (*Id.* at ¶ 15.) Thomson reported that Maher appeared to exaggerate his complaints in hopes of receiving prescribed medication. When Thomson did not prescribe medicine—since he has no authority to do so—Maher became verbally aggressive. Officers removed him from Thomson's office.[2]

On May 28, 2019, Maher submitted a request to see the psychiatrist "NOT 'BEN' Thomson." (*Id.* at Ex. 8.) A nurse replied that Maher was already scheduled to see the psychiatrist. That appointment was scheduled for June 12, 2019, the first day that CVRJ's permanent contracted psychiatrist began seeing patients there. In preparation for that

---

[2] Thomson states that he "did not deny [Maher] medical care [and did not] [verbally assault or physically attack" him, as Maher alleges in the Complaint. (Thomson Decl. ¶ 25.)

appointment, Thomson prepared a note on June 7, 2019, outlining Maher's condition for the psychiatrist's review. Thomson was out on vacation from June 10 through June 14, 2019.

On June 12, 2019, Maher refused to attend his scheduled psychiatrist appointment. He was placed on suicide watch in a cell in the booking area. The psychiatrist and a nurse went to Maher's cell and "made every effort to speak with him," but he refused to talk with the psychiatrist. (*Id.* at ¶ 18; Ex. 10.) Maher remained on suicide watch overnight as a precaution. On June 13, 2019, a mental health counselor evaluated Maher and determined that he could be released from suicide watch and returned to the general population.

On June 20, 2019, Maher again asked "to see the psychiatrist Not Ben Thomson ASAP." (*Id.* at Ex. 12.) A staff member responded, reminding Maher that the psychiatrist had tried twice to evaluate him, but both times, he had refused to talk to her. The response advised Maher that he would need to request to meet with a mental health counselor to complete an intake evaluation before he could again be placed on the list to see the psychiatrist. Thomson explains that "the intake appointment is a structured interview to gather the necessary information that the psychiatrist needs before he/she begins treating this inmate." (*Id.* at ¶ 20.)

On July 10, 2019, Thomson met with Maher to discuss the inmate's June 20, 2019 request to see the psychiatrist. Due to previous threats Maher had made against Thomson, Officer Mays was also present. Maher told Thomson that he believed he had a scheduled appointment with the psychiatrist that day. Thomson informed Maher that, because he had previously refused his appointments with the psychiatrist, he was on the list to see the psychiatrist, but did not have a scheduled appointment on July 10, 2019. After this visit, Thomson asked security officers to monitor Maher in booking to prevent any self-inflicted

harm. Staff scheduled Maher to see the psychiatrist on July 24, 2019. On July 23, 2019, Thomson met with Maher and completed the intake assessment. On July 24, 2019, Maher attended the psychiatric evaluation by Dr. Hafiz, who changed his prescription medications to Effexor and Zyprexa and continues to monitor his mental health needs.

## II.     STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, Maher must present sufficient evidence that could carry the burden of proof of his claims at trial. *See id.* at 252. He "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Id.* at 248.

Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).[3] A *pro se* litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). Where a *pro se*

---

[3] The court has omitted internal quotation marks, alterations, and/or citations here and throughout this opinion, unless otherwise noted.

plaintiff fails to respond to a defendant's specific evidence contradicting the conclusory allegations of his complaint, however, that defendant may be entitled to summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion.").

### III. ANALYSIS

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). The Due Process Clause requires state officials to provide medical care to pretrial detainees. *Martin v. Gentile*, 849 F.2d 863, 870–71 (4th Cir. 1988). "While the precise scope of this obligation is unclear," it is well established that "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs' within the meaning of" the Eighth Amendment standard applicable to convicted inmates. *Id.* at 871 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976); *Whisenant v. Yuam*, 739 F.2d 160, 163 n.4 (4th Cir. 1984); *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir. 1978)).

The medical-need prong is objective and requires facts showing that the inmate's medical condition is "serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "Courts treat an inmate's mental health claims just as seriously as any physical health claims." *DePaola v. Clarke*, 394 F. Supp. 3d 573, 591 (W.D. Va. 2019). "[T]he mere fact that prison officials provide some treatment does not mean they have provided constitutionally adequate treatment." *Heyer v.*

*U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017). The treatment provided by a prison must "be adequate to address the prisoner's serious medical need." *Id.*

The deliberate-indifference portion of the constitutional standard is subjective. The plaintiff must show that the defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; the official must have had *actual*, *subjective* knowledge of *both* the inmate's serious medical condition *and* the excessive risk of harm posed by his own action or inaction. *Jackson*, 775 F.3d at 178. Deliberate indifference

> can be established by showing that the medical treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). . . . "[A]n inadvertent failure to provide adequate medical care" does not satisfy the standard, and thus mere negligence in diagnosing or treating a medical condition is insufficient. *Estelle*[, 429 U.S. at 105–06].

*Shover v. Chestnut*, 798 F. App'x 760, 761–62 (4th Cir. 2020). "[A] mere difference of opinion regarding the adequate course of [medical or psychiatric] treatment does not give rise to an Eighth Amendment violation." *U.S. v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011); *see also Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable.").

In an unverified response to Thomson's summary judgment evidence, Maher does not dispute the accuracy of the records about the mental health and medical treatment provided to him at CVRJ between February 4 and July 24, 2019. Rather, Maher complains that on February 4, 2019, although Thomson noted "8 things wrong with Maher" and his request for mental health medication, Thomson "labeled [Maher] as a malingerer," did not immediately

send him to a psychiatrist, and thus for six months, prevented Maher from getting treatment for his mental health disorders as diagnosed by Dr. Hafiz on July 24, 2019. (Resp. 2–3 [ECF No. 44].) This assessment of Maher's course of treatment and Thomson's actions is belied by the undisputed medical records.

For purposes of this Opinion, the court will assume that Maher had a serious medical need that required mental health care in 2019. But Maher has failed to establish a genuine issue of material fact supporting his claim that Thomson acted with deliberate indifference to his medical or mental health needs at any time. Indeed, the undisputed evidence indicates otherwise.

The records reflect that from the first visit with Maher on February 4, 2019, Thomson did not deny Maher mental health care. Rather, Thomson conducted a mental health assessment, took detailed notes, and properly advised Maher that he could not prescribe medication. Despite suspicions that Maher was exaggerating his reported symptoms to get medication, Thomson noted that Maher should be scheduled to see the jail physician for his complaints of anxiety, since no psychiatrist was on contract to treat jail inmates at that time. This doctor's appointment was scheduled for February 14, 2019, less than two weeks later, but *Maher* refused to attend it. Thomson cannot be faulted for Maher's decision to delay in his mental health treatment. When Maher agreed to see the doctor on March 8, 2019, the doctor diagnosed him with anxiety and depression and prescribed medications (Lexapro and Vistaril). Jail staff then provided these medications to Maher for months, until the contracted psychiatrist began work in July 2019.

Moreover, between March and July 2019, although Maher was receiving mental health medications, Thomson promptly responded when staff referred Maher's requests for mental health care to him and monitored Maher's needs. Assessing Maher on April 11, 2019, Thomson once again noted questions about the authenticity of the inmate's reported mental health symptoms. Nevertheless, Thomson directed that Maher should be placed on the list to see a psychiatrist and noted that Maher's prescribed mental health medications might need adjustment. After another assessment on May 14, 2019, Thomson noted that Maher was already receiving medications and was on the list for a psychiatric exam in the future. In late May 2019, Thomson learned that Maher was scheduled for a psychiatric exam on June 12, 2019, the first available day for such appointments at CVRJ. Well before that appointment, Thomson prepared the type of report that the psychiatrist would need to begin seeing Maher immediately as a patient. But on the day of the appointment, Maher refused—twice—to participate with the psychiatrist. Again, Maher caused the delay in his psychiatric care, not Thomson.

Maher also delayed his treatment by the psychiatrist by refusing to comply promptly with the jail's mental health procedures—which required referral from, and an intake interview by, the mental health counselor. For these purposes, based on Maher's June 20, 2019 request for psychiatric care, Thomson scheduled a meeting with Maher on July 10, 2019. Maher wanted to see the psychiatrist instead of Thomson. But Thomson explained that, although Maher was on the psychiatrist list, he could not schedule that appointment without first performing an intake assessment on him. Concerned for Maher after that meeting, Thomson asked that he be monitored to ensure he did not harm himself. Thomson was able to conduct

the intake assessment on June 23, 2019, and Maher met with the psychiatrist the next day. While the psychiatrist changed Maher's medications, she did not order any emergent psychiatric care. In short, the record indicates that Thomson provided assessment and care to Maher throughout the relevant time period.

Maher apparently argues that Thomson should have immediately referred him to a psychiatrist for treatment on February 4, 2019, regardless of the jail's staffing problems. But Maher's desire for immediate psychiatric intervention does not alter the outcome. Thomson's notes indicate that he did not find any need for emergent psychiatric care at that time and made a judgment to refer Maher to the jail physician. Maher's disagreement with Thomson's professional judgment is not sufficient to support a finding of deliberate indifference. At the most, such a claim implies negligent diagnosis or inadvertent failure to treat, neither of which meets the required legal standard. Moreover, when the physician examined Maher, he also did not diagnose Maher with any emergency need to see a psychiatrist, prescribing mental health medications instead. Similarly, at every step of Maher's course of treatment, whenever Thomson learned of Maher's newest mental health complaints, he assessed those complaints himself, noted medications and exams were already being provided or scheduled, or referred Maher for additional care by the jail doctor or the psychiatrist, or both. While Maher did not see the psychiatrist as quickly as he believed appropriate, he has not shown that Thomson, at any time, knew that Maher's condition required more prompt or different care than the CVRJ staff and doctors provided to him. The court simply cannot find that Thomson's actions, treatment decisions, or referrals were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Militier*, 896 F.2d at 851.

## III. CONCLUSION

For the stated reasons, the court will grant Thomson's Motion for Summary Judgment (ECF No. 33).

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 25th day of July, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE